[No. E013133. Fourth Dist., Div. Two. Sept. 26, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
CRUZ ALBERTO VALENZUELA, Defendant and Appellant.

 

COUNSEL

Alice C. Shotton, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

DABNEY, J.—Defendant Cruz Alberto Valenzuela appeals following a guilty plea to transportation of cocaine (Health & Saf. Code, § 11352, subd. (a)). He contends the trial court erred in denying his motion to suppress evidence seized from his vehicle when he was stopped and questioned at an agricultural inspection station. We agree and reverse.

FACTS

The facts are essentially undisputed. Defendant is a resident alien and holds a valid "green card." On February 10, 1993, defendant was driving along Interstate Highway 10 near Blythe, California. Defendant was driving a Honda automobile with California license plates. Defendant was stopped at an agricultural inspection station located at Blythe.

Defendant came to a stop as required for agricultural inspection. A United States border patrol agent, Joel Hudson, was standing near (within six to eight feet of) the agricultural inspector. Agent Hudson noticed that defendant appeared to be Hispanic. Hudson was standing close enough to overhear the inspector talking with defendant. When the agricultural inspector finished questioning defendant, Agent Hudson stepped forward and asked defendant if he would be willing to move out of the inspection lane and park at the side of the road. Hudson testified he decided to make this request because defendant spoke little or no English, because defendant made eye contact with the agricultural inspector but did not make eye contact with Hudson, and because defendant was "kneading" the steering wheel as if nervous or anxious to leave. At that time, Hudson testified, he believed defendant was probably an illegal alien. He identified himself as an immigration officer and asked defendant to move to the side of the road for safety reasons, i.e., a high volume of traffic was passing through the station.

At the side of the road, Agent Hudson asked defendant for his country of citizenship. Defendant said he was a citizen of Mexico, and handed an I-551

resident alien form (green card) to Hudson. Hudson noticed that defendant's hands were shaking when he gave the card to Hudson. Hudson then began asking defendant questions about where he had been and where he was going. Defendant told Hudson that he had just come from spending three days visiting relatives in Phoenix, Arizona, and that he was returning home to Los Angeles. Hudson noticed there was no luggage in the passenger compartment of the car, and felt this was unusual for a three-day visit. Defendant, according to Hudson, also "seemed to be unable" to tell Hudson what part of Los Angeles he was from. At that point, agent Hudson formed the opinion that defendant might be transporting either a person or a contraband substance in the trunk of the car.

Agent Hudson then asked defendant for permission to look in the trunk. Defendant consented, and Hudson opened the trunk. Hudson saw a large speaker box. He knew from experience that controlled substances and currency are often transported in such boxes. Hudson then asked defendant for consent to use a dog to sniff defendant's vehicle. Defendant consented. Hudson then returned defendant's green card. Agent Hudson took the dog around the outside of defendant's car. The dog did not alert. Hudson allowed the dog into the interior of the vehicle. The dog went to the backseat and alerted by sitting down. Hudson took the dog to the rear of the vehicle, opened the trunk slightly, and the dog alerted again. Hudson then informed other border patrol agents, who then disassembled the trunk area. Inside the speaker box they found $29,700 in currency and two bricks of cocaine. Defendant was placed under arrest.

Defendant was charged by information with one count of transportation of cocaine (Health & Saf. Code, § 11352, subd. (a)). An enhancement allegation that defendant was selling and possessing for sale a substance containing 28.5 grams or more or cocaine hydrochloride, and 57 grams or more of a substance containing cocaine hydrochloride, within the meaning of Penal Code section 1203.073, subdivision (b)(1), was also charged.

Defendant moved to suppress the evidence seized as a result of the vehicle search. (Pen. Code, § 1538.5.) The trial court denied the motion. Defendant thereafter pled guilty to the count of transporting cocaine, and admitted the enhancement under Penal Code section 1203.073, subdivision (b)(1). Defendant was sentenced to four years in the state prison and received a fine of $500. Defendant now appeals.

## DISCUSSION

Defendant contends the trial court improperly denied his motion to suppress evidence. He argues (1) Agent Hudson had no reasonable suspicion

that defendant's vehicle contained illegal aliens, so as to justify detaining defendant (i.e., by asking him to pull to the side of the road), (2) there was no probable cause to search defendant's car, and (3) defendant did not, under the circumstances, voluntarily consent to a search of his car.

The People argue in reply that (1) Agent Hudson had a reasonable suspicion that defendant was an illegal alien because of the kind of vehicle defendant was driving, because defendant appeared nervous and would not meet Hudson's eyes, and because defendant did not speak English well; (2) there was probable cause to search defendant's car because defendant appeared nervous, because the car had a trunk capable of holding an illegal alien, because defendant did not have luggage in the passenger compartment of the car, and because defendant could not specify where in Los Angeles he lived; and (3) defendant's consent was not rendered involuntary simply because defendant gave the consent while detained.

 On appellate review of a motion to suppress evidence, we must accept the trial court's resolution of disputed facts and its assessment of credibility (see *People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]), but, the issue whether, under the facts found, a seizure or search was unreasonable is a question of law, as to which the appellate court is bound to exercise its independent judgment. (See *People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436]; *People* v. *Leyba* (1981) 29 Cal.3d 591, 597 [174 Cal.Rptr. 867, 629 P.2d 961].) Here, the facts are essentially undisputed. The issues presented—the lawfulness of the detention and search—therefore present questions of law, and we are not bound by the substantial evidence standard. (*People* v. *Loewen, supra,* 35 Cal.3d 117, 123-124.)

## I. *Detention*

### A. *The Detention Required a Reasonable Suspicion of Law Violation.*

 A detention is a seizure of the person. It is generally agreed that " '[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' (*United States* v. *Mendenhall* [1980] 446 U.S. [544,] at p. 554 [64 L.Ed.2d [497,] at p. 509] [plur. opn. of Stewart, J.].)" (*Wilson* v. *Superior Court* (1983) 34 Cal.3d 777, 790 [195 Cal.Rptr. 671, 670 P.2d 325], fn. omitted; see also *INS* v. *Delgado* (1984) 466 U.S. 210, 216-217 [80 L.Ed.2d 247, 255-256, 104 S.Ct. 1758]; *In re James D.* (1987) 43 Cal.3d 903, 913 [239 Cal.Rptr. 663, 741 P.2d 161].)

Defendant, a traveler on the highway, was informed by advance warning signs, by painting on the roadway surface and by traffic signals (stop signs), that he was required to stop at the agricultural inspection station. He did so, and was there questioned by the agricultural inspector. Upon the completion of the agricultural inspection, defendant should have been free to proceed on his way. Before the agricultural inspector even had time to step aside, however, Agent Hudson immediately approached. Agent Hudson thus cloaked himself in and effectively asserted the "official authority" of the fully uniformed agricultural inspector, under whose direction defendant was initially required to stop. (See *Wilson* v. *Superior Court, supra,* 34 Cal.3d 777, at p. 789.) Agent Hudson, himself in full uniform and identifying himself as an immigration officer, also made a show of his own official authority over defendant in directing him to park at the side of the road.[1]

Agent Hudson testified to his subjective belief that defendant was free to leave after the agricultural inspector had finished questioning defendant, but, after defendant had agreed to park at the side of the road, that he was not free to leave until Agent Hudson had determined his immigration status. It was clear from Agent Hudson's testimony about the sequence of events, however, that defendant had no possible opportunity to leave after the agricultural inspector had finished questioning him. Agent Hudson had already decided that defendant might be an illegal alien, and moved in before the agricultural inspector had stepped aside. Under all the circumstances, including the compulsory agricultural inspection stop, the presence of multiple uniformed officers, and the order to park at the side of the road, a reasonable person in defendant's position could hardly have felt free to leave. This was not a mere consensual encounter; defendant was detained.

The People identify three types of potential immigration detentions. First, persons may be stopped by immigration officers at the border or its functional equivalent without probable cause or a reasonable suspicion upon which to stop the traveller. The border stops are deemed reasonable "by the single fact that the person or item in question had entered into [the] country from outside." (*United States* v. *Ramsey* (1977) 431 U.S. 606, 619 [52 L.Ed.2d 617, 628, 97 S.Ct. 1972].)

Second, border agents may make stops at reasonably located, fixed checkpoints. Again, agents may stop persons without any individualized suspicion as to immigration status. (*United States* v. *Martinez-Fuerte* (1976) 428 U.S. 543, 562 [49 L.Ed.2d 1116, 1131, 96 S.Ct. 3074].) Moreover, probable cause

---

[1]The tenor of Agent Hudson's testimony indicated that Hudson did not merely ask whether defendant would be willing to move aside so Agent Hudson could speak with him; rather, he directed defendant to move his car to the side of the road.

is not required to move a detainee to a secondary inspection area (*id.* at p. 563 [49 L.Ed.2d at pp. 1131-1132]), although probable cause is required for a search of the vehicle. (*United States* v. *Ortiz* (1975) 422 U.S. 891 [45 L.Ed.2d 623, 95 S.Ct. 2585].)

Third, border patrol agents may operate roving patrols, but in such cases they "may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." (*United States* v. *Brignoni-Ponce* (1975) 422 U.S. 873, 884 [45 L.Ed.2d 607, 618, 95 S.Ct. 2574].) When a roving patrol lawfully stops a vehicle, the agents may search only upon probable cause or consent. (*United States* v. *Ortiz, supra*, 422 U.S. 891, 895 [45 L.Ed.2d 623, 628, 95 S.Ct. 2585]; *Almeida-Sanchez* v. *United States* (1973) 413 U.S. 266, 273 [37 L.Ed.2d 596, 602-603, 93 S.Ct. 2535].)

■ The People here contend that Border Patrol Agent Hudson stopped defendant based upon a reasonable suspicion that defendant was an illegal alien. Thus, the People appear to concede that the standard for a roving stop (i.e., specific, articulable facts giving rise to a reasonable suspicion) must be met.

The concession is wise. The stop undertaken here was not a border stop, nor was the checkpoint a fixed *immigration* checkpoint. The Blythe checkpoint is an *agricultural inspection* checkpoint. The testimony presented at the motion to suppress evidence established that the checkpoint was an agricultural inspection station, operated at a permanent structure on Interstate 10, just west of the California-Arizona border. Westbound motorists approaching the checkpoint are warned of a stop ahead. Although Agent Hudson could not recall precisely what the signs approaching the agricultural station said, he testified that there was *no* sign warning that the checkpoint was an immigration stop.

Agent Hudson also testified that he was assigned to patrol Interstate 10 from the 45-mile marker inside Arizona to approximately 30 miles west of Blythe, and that his assignment was to observe traffic in all of that area.

■ Immigration stops at fixed checkpoints are held lawful, without a reasonable suspicion about the alienage of the occupants (the second type of immigration stop listed above), on the conditions that "the procedure in question was routinely and evenly applied to all vehicles; the permanent checkpoint involved little officer discretion and was not likely to result in abusive or harassing stops; and the appearance of authority of the officers

manning the checkpoint would allay the concerns of lawful travelers." (*United States* v. *Hernandez* (9th Cir. 1984) 739 F.2d 484, 486-487.)

Here, however, the seizure was not applied routinely or evenly; the individual officer's discretion whether to stop a vehicle was completely unfettered; and, indeed, when the agent would be at the checkpoint (or whether he would be there at all, as opposed to being on mobile patrol on 75 miles of highway) was also evidently left entirely to the discretion of the officer alone. There were no apparent directives or instructions from senior border patrol commanders limiting the discretion of the individual border patrol agents, or controlling their activities at the agricultural checkpoint. Nothing informed the public that an immigration inspection was to take place at the checkpoint. The Blythe agricultural inspection station therefore does not qualify as a fixed immigration checkpoint; a reasonable suspicion was required in order for Hudson to stop and question any person passing the checkpoint.

### B. *Permissible Criteria Upon Which to Base a Reasonable Suspicion.*

The United States Supreme Court in *United States* v. *Brignoni-Ponce*, *supra*, 422 U.S. 873, 884-885 [45 L.Ed.2d 607-608, 618, 95 S.Ct. 2574], held that the single factor of Mexican appearance was, by itself, insufficient to support a reasonable belief the occupant of a car was an illegal alien. The court pointed out that, although not a sufficient factor, Hispanic appearance was one among several facts that might be taken into account in formulating a reasonable suspicion. "Officers may consider the characteristics of the area in which they encounter a vehicle. Its proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic are all relevant. [Citations and fn. omitted.] They also may consider information about recent illegal border crossings in the area. The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion. [Citations.] Aspects of the vehicle itself may justify suspicion. . . . [Citations.] The vehicle may appear to be heavily loaded, it may have an extraordinary number of passengers, or the officers may observe persons trying to hide. [Citation.] The Government also points out that trained officers can recognize the characteristic appearance of persons who live in Mexico, relying on such factors as the mode of dress and haircut. . . . In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling. [Citation.]" (*Ibid.*)

The People attempt to bring themselves within the *Brignoni-Ponce* criteria; they argue that Agent Hudson had a reasonable suspicion that

defendant was an illegal alien based upon (1) "intelligence" information Hudson had received, (2) defendant's nervous behavior, (3) the fact that defendant's car had a trunk, and Agent Hudson had seen illegal aliens smuggled in trunks on numerous other occasions, and (4) defendant's inability to speak English well.

### 1. *Intelligence Information.*

Although officers may take into account "the characteristics of the area in which they encounter a vehicle"[2] and "information about recent illegal border crossings in the area" (*United States* v. *Brignoni-Ponce, supra,* 422 U.S. 873, 884-885 [45 L.Ed.2d 607, 618-619]), the "intelligence" information Agent Hudson had was of little or no value.

When he was asked if he had received education or training with respect to alien smuggling and narcotics smuggling, Agent Hudson mentioned only that he had received 40 hours of training in the detection of *controlled substances.* Agent Hudson testified the border patrol agents in Blythe received "continuous bulletins" as to the different smuggling routes for illegal aliens and narcotics, but, when he was asked about the content of the information he received in the bulletins about alien smuggling through the Blythe agricultural inspection station, he stated, "We have a continuous flow of bulletins coming into our office in regards to *literally hundreds of vehicles* that might be coming from the border areas, or coming from Phoenix, or coming from other parts of the United States that may be traveling through Interstate 10." Agent Hudson testified that the "intelligence information" he had received, regarding the types of vehicles involved in smuggling controlled substances, "probably would" have included the description of a Honda sedan like that driven by defendant because "We received lookouts *on probably every type of vehicle imaginable.*" Furthermore, when he was asked whether he had information about an increase in drug smuggling in the area of the Blythe agricultural inspection station, Agent Hudson stated "I have noticed an *increase in apprehensions* of drug smugglers, yes," and acknowledged that he had been involved in some of those cases.

It is painfully clear that the "intelligence" information Agent Hudson possessed provided no reasonable means of distinguishing a suspicious

---

[2]The Blythe agricultural inspection station is approximately 82 miles north of the United States-Mexico border, along Interstate Highway 10. Interstate 10 is an east-west highway. It does not touch or approach the border. It is a major route (in the area here in question) between Phoenix, Arizona, and Los Angeles, California. Interstate 10 is well north of and runs parallel to Interstate Highway 8, another major east-west route. Interstate 8, although much closer to the border, lies entirely within the United States. (See *Almeida-Sanchez* v. *United States, supra,* 413 U.S. 266, 267-268 [37 L.Ed.2d 596, 599, 93 S.Ct. 2535].)

vehicle from a nonsuspicious one. Agent Hudson described no information from bulletins about recent illegal border crossings, or other movements of illegal aliens, which would give him any special reason to single out defendant. He had received bulletins on "literally hundreds of vehicles," none of which he linked to his decision to detain. Agent Hudson was alerted to be on the lookout for "every type of vehicle imaginable." Unlike the explanation in *Brignoni-Ponce* that, for example, officers had experience with "certain station wagons" that had compartments sufficient to hide illegal aliens, the information here about "every type of vehicle imaginable" did not constitute specific or articulable information upon which to base a belief that defendant was in the country illegally, or that he was doing anything else illegal.

The "increase in apprehensions" of drug smugglers at the Blythe agricultural inspection station amounts to nothing more than a self-fulfilling prophecy; we note that this case is one of five that has come to this court for review in recent months, all based on "piggybacked" border agent stops at the Blythe agricultural inspection station. (See also *People* v. *Sanchez* (May 6, 1994) E012842 [nonpub. opn.]; *People* v. *Paez* (Aug. 31, 1994) E013082 [nonpub. opn.]; *People* v. *Espinoza* (E012723, app. pending); and *People* v. *Corpus* (July 22, 1994) E013353 [nonpub. opn.].) An increase in possibly unlawful drug arrests does not justify more unlawful drug arrests.

2. *Nervousness.*

The People argue that defendant's nervousness gave Agent Hudson a reasonable suspicion that defendant was engaged in some unlawful activity. We disagree. Failure to meet the border agent's gaze, and kneading of the steering wheel, even if indicative of nervousness, does not provide a sufficient reason to suspect defendant was in the country illegally or doing anything else illegal. (*People* v. *Aldridge* (1984) 35 Cal.3d 473 [198 Cal.Rptr. 538, 674 P.2d 240].) Anyone—undocumented aliens, legal resident aliens, or citizens alike—could easily be apprehensive of a series of forced encounters with uniformed authority figures. (See *People* v. *Lawler, supra,* 9 Cal.3d 156, 162.) In addition, the inference that "nervousness" existed and was based on defendant's desire to avoid contact with Agent Hudson is pure speculation. Defendant was not attempting to flee or evade Agent Hudson; he simply did not look directly at him and kneaded his hands on the steering wheel.

3. *Aspects of Defendant's Vehicle.*

The People next point out that "[defendant's] car was equipped with a trunk which Agent Hudson believed was capable of concealing an illegal

alien. Thus, [defendant's] car was of the type that could hide illegal aliens." The fact that defendant's sedan was equipped with a trunk does not provide any particular reason to raise suspicion in the mind of the officer. That criterion would justify stopping every car with a trunk. Indeed, virtually every vehicle on the road, not just a sedan with a trunk, is "capable of concealing an illegal alien."

In *Brignoni-Ponce*, the court pointed out that "For instance, officers say that certain station wagons, with large compartments for fold-down seats or spare tires, are frequently used for transporting concealed aliens." (*United States* v. *Brignoni-Ponce, supra*, 422 U.S. 873, 885 [45 L.Ed.2d 607, 619].) Experience shows that vans, pickup trucks and campers also can be used to transport concealed illegal aliens. (See, e.g., *U.S.* v. *Gomez* (9th Cir. 1990) 901 F.2d 728, 729; *United States* v. *Ortega-Chavez* (5th Cir. 1982) 682 F.2d 1086, 1088; *U.S.* v. *Arrendondo-Hernandez* (5th Cir. 1978) 574 F.2d 1312, 1313; *United States* v. *Nichols* (5th Cir. 1977) 560 F.2d 1227.)

It is not merely that a vehicle is "capable" of transporting illegal aliens that gives rise to a "reasonable suspicion"; that characteristic applies to virtually any vehicle. In a number of cases, however, the border officer observed something additional which genuinely could give rise to a reasonable suspicion that illegal aliens might be concealed in the vehicle. In some instances, the vehicle appeared to be heavily laden. In others, the officer noticed a structural or other discrepancy suggesting a concealed compartment. Here, there was no evidence that defendant's car was weighted down or that there was anything suspicious about the vehicle itself. Agent Hudson admitted he saw nothing about the trunk that indicated that illegal aliens or drugs were being smuggled in it. The only articulated fact about defendant's vehicle upon which Agent Hudson relied was the mere fact that a sedan has a trunk. Agent Hudson articulated no reason why that fact should have raised any suspicion as to *this* vehicle, as opposed to any other sedan.

4. *Defendant's Inability to Speak English Well.*

Finally, the People urge that defendant's ability to speak Spanish and relative inability to speak English is a "relevant factor" in Agent Hudson's determination that defendant was probably an illegal alien. Agent Hudson testified that defendant had difficulty answering the agricultural inspector's questions in English, and switched to Spanish. The People argue that, "in the totality of the circumstances, [defendant's] avoidance of eye contact with agent Hudson, [defendant's] nervous conduct, and his inability to converse in English constituted substantial evidence [that defendant] may have been an illegal alien."

In order to justify a detention, there must be a *reasonable* suspicion that the person detained is engaged in criminal activity or, in the case of border patrol stops, is in the country in violation of the immigration laws. Defendant here was driving a sedan bearing California license plates. The sedan had a trunk. Defendant did not look directly at Agent Hudson while defendant was dealing with the agricultural inspector. Defendant kneaded the steering wheel. Defendant appeared Hispanic and spoke Spanish better than English. These characteristics describe millions of people in the same geographic region who are citizens or lawful residents of the United States. Moreover, nothing in Agent Hudson's "intelligence" information differentiated defendant's vehicle from any other for purposes of believing it was connected to unlawful entry into the country or to transportation of illegal aliens or contraband substances. Plainly, Agent Hudson had no "reasonable suspicion" that defendant was an illegal alien; his decision to pull over defendant's car was not based on articulable facts giving rise to such a reasonable suspicion.

We conclude that defendant was unlawfully detained. Agent Hudson had no justifiable reason for ordering defendant aside to a secondary inspection area. All the evidence seized was obtained as a product of the unlawful detention. All the evidence seized from defendant's car should have been suppressed.

## II. *Probable Cause to Search*

Even assuming defendant's movement to the side of the road could be considered voluntary consent to a detention, Agent Hudson would need either probable cause to search or voluntary consent to search. The People contend there was probable cause for the search, based on defendant's nervousness, his inability to pinpoint his destination in Los Angeles, and the absence of luggage in the passenger compartment of defendant's car.

In *U.S.* v. *Hernandez-Alvarado* (9th Cir. 1989) 891 F.2d 1414, drug enforcement agents stopped a car because (1) the driver and passengers appeared nervous, (2) the driver slowed from 65 miles per hour to 55 miles per hour after seeing the officers' car, (3) a 2-way radio antenna protruded from the trunk of the car, (4) defendant lived in a border neighborhood where several people were suspected of dealing in narcotics, (5) defendant's car bore a license plate frame indicating it had been bought at a dealership where several drug smugglers had also purchased vehicles, and (6) the trunk of the car (an Oldsmobile) was rather large. The Court of Appeal held that these factors together were insufficient to justify even an investigatory stop; a fortiori, they would not constitute probable cause for a search.

In *U.S.* v. *Rodriguez* (9th Cir. 1992) 976 F.2d 592, border patrol agents stopped the defendant's car because (1) the defendant was Hispanic, (2) he was alone, (3) the defendant looked straight ahead and did not "acknowledge" the agents' presence, (4) defendant was driving a Ranchero, a type of vehicle that had sufficient space behind the seat for an alien to hide, (5) one of the agents had seen a picture of a similar vehicle that had once (at some unspecified place and time) been involved in another smuggling case, (6) the car appeared to be heavily loaded, and (7) the defendant looked at the agents, who followed him, several times in his rearview mirror. Again, the Court of Appeals held these factors did not support a reasonable suspicion that the defendant was engaged in unlawful activity. They also would not support a finding of probable cause to search.

Failing to meet the agent's gaze while defendant was conversing with the agricultural inspector is nothing remarkable. (See *Nicacio* v. *United States I.N.S.* (9th Cir. 1986) 797 F.2d 700 [avoidance of eye contact is an improper consideration unless "special circumstances [] make innocent avoidance of eye contact improbable"].) Kneading the steering wheel during a brief stop in a long drive is also nothing noteworthy. The supposed factor that defendant "seemed to be unable" to specify an exact location in Los Angeles to which he was traveling is speculative at best.[3] Many people refer to Los Angeles in no more specific terms. In addition, there is no indication Agent Hudson asked defendant for his exact address. That Agent Hudson found it suspicious that defendant did not put any luggage for a three-day trip in the passenger compartment of the car simply passes understanding. Trunks are built into cars precisely to provide a safe and convenient place to put luggage. The only possible fact that might have relevance is that defendant appeared to be nervous (his hand was shaking) when he handed his green card to Agent Hudson. There are possible innocent explanations for this fact, however; even a lawful resident alien could quite naturally be nervous at being stopped by an immigration officer. Whether alone or in combination with the remaining dubious factors upon which the People rely, it was plainly insufficient to provide probable cause to search defendant's car.

### III. *Consent to Search*

■ In the absence of probable cause to search defendant's car, defendant must have voluntarily consented to the search in order for it to be valid.

---

[3]Agent Hudson testified:

"Q Did you ask [defendant] about his residence in Los Angeles?

"A Yes, I did.

"Q Was there anything unusual without [*sic*] the defendant's response?

"A I asked him where he lived, what parts of Los Angeles he resided in, and he seemed to be unable to give me an answer."

The People merely argue that, because a person's status of being under arrest or in custody does not, in itself, vitiate a voluntary consent (see *People v. James* (1977) 19 Cal.3d 99 [137 Cal.Rptr. 447, 561 P.2d 1135]), defendant's consent here was voluntary. We disagree. The People fail to consider that the burden of proof was upon them to demonstrate affirmatively that the consent was voluntary. The People fail to sustain that burden.

Here, Agent Hudson, who had identified himself as an immigration officer, ordered defendant to park at the side of the road. Agent Hudson inquired into defendant's immigration status and, for the purpose of checking that status *took away defendant's green card.* The green card appeared to be valid and in order. When it appeared that defendant was in fact legally in the country, *then* Agent Hudson formed the opinion that defendant's nervousness must be related to something else, like drug smuggling. Agent Hudson did not return the green card at that point, however; he first obtained defendant's consent to search the trunk, and to conduct a search by a drug-sniffing dog. Only after Agent Hudson obtained those consents did he return defendant's green card.

The circumstances were inherently coercive. As the court in *People v. James, supra,* 19 Cal.3d 99, itself pointed out, although it is " 'not conclusive' in the determination of voluntariness," "the defendant's custody at the time of giving consent to search is a circumstance which is of 'particular significance' " in making that determination. (*Id.* at p. 109.) Defendant, an alien, could go nowhere while Agent Hudson held his green card. Agent Hudson was withholding the only document that evidenced defendant's right to be in the United States.

Moreover, Agent Hudson had, from defendant's point of view, complete control over when, if ever, the green card would be returned. Indeed, the facts indicate Hudson did not return the green card immediately when he had satisfied himself that defendant was lawfully in the country. At the point at which Agent Hudson determined defendant was lawfully in the country, he no longer had any reason to withhold defendant's green card. Yet, when he was asked what circumstances led him to believe defendant might have drugs in the trunk, Agent Hudson responded, "*After I determined that he was legally in the United States* there, I wasn't sure of what reasoning you would have to be as nervous as he was." (Italics added.) He did not return defendant's green card until he had secured permission to search for drugs.

Where the circumstances indicate that a suspect consents because he believes resistance to be futile, or if any suggestion is made to the suspect that "it would be unwise or fruitless to resist," the search cannot stand.

(*People* v. *James*, *supra*, 19 Cal.3d 99, 112.) "Thus an apparent consent has been deemed involuntary when given in response to 'covert threats of official sanction.' " (*Ibid.*) Agent Hudson's withholding of the green card past the time when he believed it to be valid evidences his willingness to use official sanction beyond its proper scope.

In addition, the *James* court upheld the defendant's post-arrest consent in part on the justification that " 'The mere asking of permission to enter and make a search carries with it the implication that the person can withhold permission for such an entry or search.' [Citations.]" (*People* v. *James*, *supra*, 19 Cal.3d 99, 116.) Thus, "when a person of normal intelligence is expressly asked to give his consent to a search of his premises, he will reasonably infer he has the option of withholding that consent if he chooses." (*Ibid.*) The court held that the fact of a defendant's arrest may affect his will to assert his right to refuse consent, but it would not affect his knowledge of the right. (*Ibid.*)

The defendant here faced circumstances wholly different from those in *James*. An American of normal intelligence might well be presumed to know his or her rights. The mere fact of an arrest would not necessarily affect an American defendant's knowledge of his or her rights. A foreigner may not be so well informed, however. To an alien, who is present in the country on sufferance and whose privilege to be here can be revoked, a request made by an official of the host (foreign) government may well not, in fact, imply a right to refuse such an official request. The risk of refusal may be too great.[4] A person's experiences with authority figures may also reasonably indicate that compliance is mandatory. In addition, depending on the cultural customs and mores of the alien's home country, he or she may not appreciate the subtlety—assumed in this culture—that making a request implies a right to refuse.

Finally, it is axiomatic that a consent to search produced by an illegal arrest or detention is not voluntary. (See, e.g., *People* v. *Leib* (1976) 16 Cal.3d 869, 877 [129 Cal.Rptr. 433, 548 P.2d 1105]; *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 251 [118 Cal.Rptr. 166, 529 P.2d 590]; *People* v. *Wilson* (1956) 145 Cal.App.2d 1 [301 P.2d 974].) Here, not only was defendant's detention unlawful ab initio, because not based on a reasonable suspicion of unlawful activity, Agent Hudson also unreasonably withheld his green card beyond the time necessary for him to be satisfied about its authenticity. Only after Agent Hudson had determined that defendant was

---

[4]In *James*, the defendant had been lawfully arrested, and was in handcuffs. He thereafter gave consent to a search of his residence. James had nothing left to lose by giving permission to search.

lawfully in the United States did he decide to search the car for drugs; only then did he ask for permission to search the car. It was undisputed that defendant's green card was not returned until after he had consented to a dog search.

### DISPOSITION

Agent Hudson could articulate no specific facts to justify selecting defendant's vehicle for further examination. The criteria upon which he relied did not differentiate defendant from any number of innocent persons. There was nothing upon which to base a reasonable suspicion defendant was either in the country illegally or that he was otherwise engaged in illegal activity. Likewise, Agent Hudson lacked probable cause to search. Defendant's purported consent to the search was the product of an illegal detention and inherently coercive circumstances, in which he consented only while Agent Hudson unreasonably withheld his green card. Accordingly, the evidence was unlawfully seized from defendant's car. The trial court erred in denying defendant's motion to suppress the evidence. The judgment is reversed.

Ramirez, P. J., and McKinster, J., concurred.

A petition for a rehearing was denied October 13, 1994.