Filed 1/14/16  P. v. Rodriguez CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041343 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F26895) |
| v. | |
| RIGOBERTO NABOR RODRIGUEZ, | |
| Defendant and Appellant. | |

### INTRODUCTION

After the trial court denied his motion to suppress evidence, defendant Rigoberto Nabor Rodriguez pleaded no contest to possessing methamphetamine for sale (Health & Saf. Code, § 11378).  The court suspended imposition of sentence, placed defendant on formal probation for three years, and sentenced him to 180 days in county jail.

On appeal, defendant contends that the trial court erred in denying his motion to suppress evidence pursuant to Penal Code section 1538.5.  For the reasons stated below, we conclude the trial court properly denied the motion to suppress and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The Underlying Facts*[1]

On May 23, 2014, around 8:20 p.m., Sergeant Fish received a dispatch call regarding drug activity occurring under the Riverside Avenue Bridge in Santa Cruz. A named citizen informant reported that she saw a drug transaction occur between a woman and three Hispanic males wearing black hoodies and had bicycles. According to Sergeant Fish, this general area was known for being a high drug dealing location. In his training and experience as a police officer, he had observed a lot of drug activity in the reported area in the past.

Sergeant Fish, who was in an unmarked patrol vehicle, drove to the location where the suspected drug activity was reported. He arrived approximately five minutes after the call. Initially, Sergeant Fish did not see any individuals at the reported location and saw no pedestrians on the path. He drove north along a pathway towards the Laurel Street Bridge. The pathway, which was about four to five feet wide, was used by pedestrians, but it was also for service vehicles as well as law enforcement vehicles.

As he approached the Laurel Street Bridge, he observed defendant, and two other Hispanic men on the pathway at the south side of the bridge underpass. They were walking in the direction away from Sergeant Fish. Sergeant Fish noticed that one of the individuals, Victor Martinez, was wearing a black hoodie and had a bicycle.

Sergeant Fish slowly drove his car behind these men at approximately five to seven miles per hour. As he did, the three men looked back at Sergeant Fish and two of them "peel[ed] off slightly." Sergeant Fish had his headlights on at the time, but did not activate any of his emergency lights. Sergeant Fish stopped his car about 10 to 15 feet behind the men and got out of his vehicle. He used a flashlight as he approached the

---

[1] The recitation of the facts is based on the testimony of Santa Cruz Sheriff's Sergeant Stefan Fish, who was the sole witness to testify at the suppression hearing.

individuals, and asked them "How are you doing?" Sergeant Fish explained to them in English that he was investigating a call about a drug deal. The men nodded, however, it appeared to the officer that they had "limited English speaking skills." Sergeant Fish questioned the men in Spanish, asking them, "[¿]Yo miro en su[s] pantalones[?]," which translates to "I look in your pants?" The sergeant also used physical gestures indicating that he wanted to search their pockets. The men responded by nodding affirmatively.

Sergeant Fish walked towards them and directed them in Spanish to turn around and walk towards his car. The men began "moving around" and were not following the sergeant's directions. Sergeant Fish testified that at that point, "I was starting to feel like something was wrong. Intuition was telling me that . . . they [knew] what I wanted them to do but they were moving side-to-side." At this time, Martinez "stepped away from the rest of the group" and tossed an item. Sergeant Fish picked up the item—a white plastic container, which held individually packaged methamphetamine. He asked the three men whether they had more drugs. He did not receive a verbal response.

Sergeant Fish placed the men in handcuffs, and called for assistance. At some point during this process, Sergeant Fish conducted an initial search for weapons on defendant. He found no weapons or anything in defendant's pockets at this time. Officer Ahlers arrived at the scene shortly after Sergeant Fish's request for assistance. The officers then conducted a second search of defendant and found drugs on his person. Defendant was then arrested.

After the arrest, the citizen informant, who had reported the drug transaction, arrived at the scene. The caller told the officers that she did not think the three men were the ones she had observed earlier.

### 2. *The Charges*, *Motion to Suppress*, *Plea*, *and Sentence*

The district attorney charged defendant with possessing heroin for sale (Health & Saf. Code, § 11351; count 1), possessing cocaine base for sale (*id*., § 11351; count 2), and possessing methamphetamine for sale (*id*., § 11378; count 3).

On August 4, 2014, the trial court held a hearing on the motion to suppress. After the conclusion of the hearing, the court denied the motion. The court found that the initial encounter was not a detention, noting that "[t]here's no testimony or evidence that [Sergeant Fish] block[ed] their ingress or egress," and that the officer in this instance used a conversational tone when asking them if he could look in their pants. The court explained "So when you look at the words, the tone of voice, the expressions that were used both in the hands and the nodding of the head, I don't see that as a command. At that point he doesn't receive a 'no,' he doesn't receive a 'yes,' but . . . he asks them to the [*sic*] turn around. That could be argued that at that point it could be said that is a detention, but I'm not sure that it is based on the circumstances of the single—we have a single officer here. Three men, one officer. It's dark. The only lighting is his flashlight and his car lights. You're underneath a bridge. And it appeared to be more of a question initially about looking in the pants than a demand. The request to turn around may have been more of a request. It could be argued as a command, but under the circumstances based on what [Sergeant Fish has] heard, and he hasn't heard and his expression in speaking his broken Spanish, consent could be established at that point. So I don't see the statement to turn around as a command that transforms that into a detention."

The court found that the initial contact then transformed to a detention after Sergeant Fish observed Martinez toss the container of drugs, but concluded that the detention was justified. The court reasoned that "once . . . somebody tosses something that the officer observes and he goes to pick that up and sees that it's narcotics, then he has reasonable suspicion to believe that one or more . . . may be involved in some sort of criminal activity involving drugs which confirms the suspicion." The court thus denied the motion because it found that the initial encounter was consensual and that once the encounter transformed into a detention, it was justified by reasonable suspicion.

Following the denial of the motion to suppress, defendant pleaded no contest to possessing methamphetamine for sale (count 3). The remaining counts were dismissed.

4

The trial court suspended imposition of sentence, placed defendant on probation for three years, and sentenced him to 180 days in county jail.

## DISCUSSION

### A. The Trial Court Properly Denied the Motion to Suppress

Defendant asserts that the trial court erred in denying his motion to suppress because he was unlawfully detained, thus invalidating any subsequent consent to search. Defendant further argues that he never consented to the search and it was not otherwise justified. Alternatively, he argues that any consent he had given was subsequently withdrawn when he pulled away from Sergeant Fish and that the search exceeded the scope of any consent previously given.

#### 1. *Standard of Review*

" ' "An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] 'The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review.' [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 255.)

#### 2. *The Initial Contact Was a Consensual Encounter*

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are

5

strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 (*Manuel G.*).)

Thus, not every encounter between a law enforcement officer and a citizen constitutes a detention for Fourth Amendment purposes. "[S]eizure does not occur simply because a police officer approaches an individual and asks a few questions." (*Florida v. Bostick* (1991) 501 U.S. 429, 434 (*Bostick*).) Even when an officer has no basis for suspecting a particular individual, they may ask questions, ask for identification, and request consent to search, provided they do not coerce cooperation. (*United States v. Drayton* (2002) 536 U.S. 194, 201-202.)

"[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." (*United States v. Mendenhall* (1980) 446 U.S. 544, 553.) "[T]o determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." (*Bostick*, *supra*, 501 U.S. at p. 439; accord, *People v. Valenzuela* (1994) 28 Cal.App.4th 817, 823.) "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." (*Michigan v. Chesternut* (1988) 486 U.S. 567, 573.)

"Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled." (*Manuel G.*, *supra*, 16 Cal.4th at p. 821; see

6

also *In re Christopher B*. (1990) 219 Cal.App.3d 455, 460.) All of the circumstances involved in the encounter must be evaluated to decide whether a reasonable person would have concluded from the police conduct that he or she was not free to leave or decline the requests of the police. (*Bostick*, *supra*, 501 U.S. at p. 439.) And "[t]he officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred." (*Manuel G*., *supra*, at p. 821.)

The facts in this case support the trial court's conclusion that the encounter prior to the discovery of the discarded methamphetamine was consensual. Here, Sergeant Fish drove up slowly behind the three men before parking his car about 10 to 15 feet away from them. Sergeant Fish was the only officer at this time, and he was outnumbered by defendant and his two companions. Nothing on this record shows that Sergeant Fish blocked defendant's exit in any way. Rather, the evidence here reveals that defendant and his companions had been walking in the direction away from the officer prior to the contact, and nothing prevented them from continuing on their way. Sergeant Fish cordially greeted the men, and the men stopped and turned to the officer. The officer did not draw his weapon or use any other overt signs of authority at this time. Sergeant Fish continued using a conversational tone when explaining that he was investigating a possible drug deal and when requesting in Spanish whether he can search their pants. (See *People v. Franklin* (1987) 192 Cal.App.3d 935, 941 ["Where a consensual encounter has been found, police may inquire into the contents of pockets [citation]; ask for identification [citation]; or request the citizen to submit to a search [citation]."].) In response, the men nodded their heads, indicating that they agreed to the search.

Defendant contends that he was detained, when he was "bathed" in the light from the officer's flashlight and headlights. He relies on *People v. Garry* (2007) 156 Cal.App.4th 1100 (*Garry*) to support his argument. Defendant's reliance on *Garry* is misplaced.

7

In *Garry*, the police officer was in his patrol car in a "high-crime, high-drug area." (*Garry*, *supra*, 156 Cal.App.4th at p. 1103.) For a few seconds, the officer watched the defendant standing next to a parked car. (*Id*. at pp. 1103-1104.) After illuminating the defendant with the spotlight on the patrol car, the officer exited his vehicle and walked so " 'briskly' " that he traveled 35 feet in " 'two and a half, three seconds.' " (*Id*. at p. 1111.) The officer disregarded the defendant's statement that he was standing outside his own home, and the officer immediately asked the defendant whether he was on probation or parole. (*Id*. at pp. 1111-1112.) The appellate court determined that the police officer's conduct "taken as a whole, would be very intimidating to any reasonable person." (*Id*. at p. 1111.) "[The officer's] actions set an unmistakable 'tone,' albeit largely through nonverbal means, 'indicating that compliance with the officer's request might be compelled.' " (*Id*. at p. 1112.)

In contrast here, the officer drove his car slowly behind the three men before parking his car a few feet away. Additionally, the officer maintained a conversational and noncoercive tone and explained to them the purpose of his investigation before making any requests. Although Sergeant Fish used a flashlight and headlights to illuminate the men, use of these lights alone was insufficient to convert the consensual encounter into a detention. (See *People v. Perez* (1989) 211 Cal.App.3d 1492, 1496 ["While the use of high beams and spotlights might cause a reasonable person to feel himself the object of official scrutiny, such directed scrutiny does not amount to a detention."].) Thus, unlike *Garry*, the use of the flashlight and headlights were not combined with any overt use of force or a show of authority. Accordingly, under these circumstances, the initial encounter between Sergeant Fish and defendant prior to the discovery of the discarded drugs was not a "seizure," in which a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter. (*Bostick*, *supra*, 501 U.S. at p. 439.)

8

### 3. *The Search Was Proper*

Next, we must determine whether Sergeant Fish executed a proper search of defendant. We first note that it appears that the trial court found that the search was justified as a pat search pursuant to a lawful detention (*Terry v. Ohio* (1968) 392 U.S. 1) and denied the motion to suppress on this basis. Although we agree with the trial court's denial of the motion, we conclude that the search was justified as a search incident to a lawful arrest, rather than a detention.

A warrantless arrest is reasonable under the Fourth Amendment when an officer has probable cause to believe the person arrested has committed a criminal offense. (*People v. Kraft* (2000) 23 Cal.4th 978, 1037.) "Probable cause to arrest exists if facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that an individual is guilty of a crime." (*Ibid.*) "[P]robable cause does not require as strong evidence as is needed to convict." (*Skelton v. Superior Court* (1969) 1 Cal.3d 144, 150.) The Fourth Amendment accepts the risk that persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent. (*Illinois v. Wardlow* (2000) 528 U.S. 119, 126.) Probable cause is determined based on the totality of the circumstances, not on any isolated event. (*People v. Freeny* (1974) 37 Cal.App.3d 20, 28.)

If an officer had probable cause to arrest a defendant, then the search of that defendant would have been justified as a search incident to a lawful arrest. (*People v. Ingham* (1992) 5 Cal.App.4th 326, 330-331.) " '[A] police officer may, incident to a lawful arrest, conduct a contemporaneous warrantless search of the arrestee's person and of the area into which the arrestee might reach to retrieve a weapon or destroy evidence.' [Citation.] . . . 'The potential dangers lurking in all custodial arrests make warrantless searches of items within the "immediate control" area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved. . . .' " (*Ibid.*)

9

Here, Sergeant Fish investigated defendant and the two other men pursuant to a tip by a named citizen informant. Generally, private citizens who are witnesses to a criminal act are considered reliable. (*People v. Brueckner* (1990) 223 Cal.App.3d 1500, 1504.) Moreover, unlike an anonymous informant, a named informant is considered more reliable because the informant exposes himself or herself to potential liability of malicious prosecution or false reporting. (*Id*. at p. 1505.) The informant reported that she observed drug activity involving three Hispanic men who wore black hoodies and had bicycles. With exception to some discrepancies,[2] defendant and the two other men fit the general description. The three men were Hispanic and one of them was wearing a black hoodie and had a bicycle. Furthermore, they were close to the location of the reported drug transaction, and the officer saw no one else walking on the path that evening. Given these similarities, Sergeant Fish's reliance, in part, on the informant's information, was reasonable.

In addition, Sergeant Fish's specialized knowledge, training and experience as a police officer is relevant here. A police officer's specialized knowledge may render a specific factor suspicious, even if it appears innocent to a layman. (*People v. Mims* (1992) 9 Cal.App.4th 1244, 1248.) Here, Sergeant Fish testified that he had experience in conducting several narcotics investigations and was aware of the fact that the Riverside Avenue Bridge and the surrounding location was a high drug trafficking area. An officer may give appropriate consideration to their own knowledge of an area's reputation for being a high crime area and draw rational inferences. (*Ibid*.)

Furthermore, when Sergeant Fish directed defendant and his companions to turn around and walk towards his car, they began moving side-to-side and did not follow directions. Sergeant Fish stated that he felt that "something was wrong" at that point.

---

[2] The informant referred to hoodies and bikes in the plural form.

Moments thereafter, Sergeant Fish saw Martinez discard the methamphetamine. These observations reasonably support the officer's suspicion of criminal activity.

Defendant contends that the officer did not have probable cause and compares this case to *In re Antonio B*. (2008) 166 Cal.App.4th 435. In *Antonio B*., the officers detained the defendant after observing him walk with another minor, who was smoking a marijuana cigarette. (*Id*. at p. 442.) The officers in that case never observed the defendant smoke the cigarette, but nonetheless placed in him handcuffs because they believed that he might also have been smoking marijuana. (*Ibid*.) The appellate court found that the officers did not have reasonable suspicion to detain the defendant based on these limited facts. (*Ibid*.)

In contrast to *Antonio B*., Sergeant Fish observed Martinez discard the drugs after he had received a report about a drug transaction involving three males fitting a similar description to defendant and his two companions. Taking these circumstances together, it was reasonable for Sergeant Fish to suspect that all three men had been involved in criminal activity. Moreover, the observation of the discarded drugs was not the sole factor that Sergeant Fish relied upon to justify the arrest. Although any one of the aforementioned factors on its own may not have been sufficient to justify the arrest, based on the totality of circumstances known to Sergeant Fish at the time, there was probable cause to arrest defendant. Accordingly, the subsequent search incident to that arrest was valid, and defendant's motion to suppress was therefore properly denied.[3]

## DISPOSITION

The judgment is affirmed.

---

[3] Defendant makes multiple additional claims regarding whether he had consented to the search. Because we find that the officer had probable cause to search and that the search was pursuant to a lawful arrest, we need not reach the issue of whether defendant's consent to search was valid.

_____
Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Márquez, J.

People v. Rodriguez
H041343