[No. B153757. Second Dist., Div. Five. June 14, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN CREE MANDERSCHEID, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of the indicated part.

COUNSEL

Foster & Flanagan and Steven C. Flanagan for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Michael C. Keller and Nora Genelin, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**TURNER, P. J.**—Defendant, Steven Cree Manderscheid, appeals from his conviction, following his plea of nolo contendre, to a charge of maintenance of a place for unlawfully selling or using controlled substances. (Health & Saf. Code, § 11366.) Defendant argues the trial court improperly denied his motion to suppress evidence pursuant to Penal Code[1] section 1538.5. We affirm.

We view the evidence in a light most favorable to the order denying the motion to suppress. (*People v. Woods* (1999) 21 Cal.4th 668, 673 [88 Cal.Rptr.2d 88, 981 P.2d 1019]; *People v. Superior Court* (1974) 10 Cal.3d 645, 649 [111 Cal.Rptr. 565, 517 P.2d 829].) On September 8, 2000, Glendale Police Department Detective Todd Anderson received information from an informant. The informant had provided "reliable, accurate information in the past . . . ." The informant indicated a parolee named Bobby DiDonna was staying in defendant's residence on Shady Grove in Tujunga. Mr. DiDonna was "considered armed." Detective Anderson had previously served search warrants at defendant's residence. Detective Anderson described what he did several days before his September 8, 2000, conversation with the informant: "I ran Mr. DiDonna's name in the computer and it showed that he was a parolee at large and that there was a warrant in the system for his arrest." Prior to receiving the information from the informant, Detective Anderson had only heard that Mr. DiDonna was "just running around the Tujunga area . . . ." Detective Anderson had no permanent address for Mr. DiDonna. Prior to speaking to the informant, the only information Detective Anderson had concerning Mr. DiDonna was as follows, "My information [was] that he was running around the Tujunga area and he was staying house to house and . . . there's no permanent address for him up there." Further, Detective Anderson, who learned about defendant's mother's address, spoke to defendant's parole officer. Detective Anderson testified: "[H]is parole officer said he was not welcome at his house; and he

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

had made numerous contacts with his mother—DiDonna's mother, and that he had not been seen." Between 9:30 and 10:45 p.m. on September 8, 2000, the informant related to Detective Anderson that Mr. DiDonna was at defendant's residence. Detective Anderson immediately assembled a number of police officers in an effort to serve the parole arrest warrant by apprehending defendant.

Within one hour of speaking to the informant, on September 8, 2000, at 10:30 to 10:45 p.m., Detective Anderson, Sergeant John Stone, and five other officers arrived at defendant's home. All of the officers wore black police jackets with the name of the police department visible. Defendant's residence was in a residential neighborhood. Following a brief period of surveillance, Detective Anderson saw a man of approximately Mr. DiDonna's height leave defendant's house. Detective Anderson and other officers followed the man to a nearby automated teller machine. The automatic teller machine was located approximately one-quarter of a mile from defendant's residence. Upon questioning the man, they determined he was not Mr. DiDonna, but was a 19 year-old named Oganes Bilbulyan. Mr. Bilbulyan said that Mr. DiDonna was not in defendant's residence. Mr. Bilbulyan also denied that there were any narcotics in defendant's residence. Mr. Bilbulyan was detained while the officers returned to defendant's home. Mr. Bilbulyan was detained in order to prevent him from alerting the occupants of defendant's home that police would be returning there.

Upon returning to defendant's home by about 11:00 p.m., Detective Anderson went to the back door by way of a gate accessible from the driveway. Detective Anderson had to open the gate in order to walk into defendant's backyard. Detective Anderson knocked on the door. Someone inside the residence inquired, "Who is it?" Detective Anderson responded, "It's Todd." Detective Anderson heard someone run through the house. Detective Anderson then radioed that the occupants were "running." The officers stationed in front of the house radioed Detective Anderson that men were coming out of the front door. Detective Anderson then ran to the front of the house. None of the officers had their guns drawn. The officers were ordering the people out of the residence. Detective Anderson asked defendant if Mr. DiDonna was in the house. Defendant did not respond. Detective Anderson asked if he could look inside the house. Defendant responded, "Yes." Prior to defendant's agreement to permit Detective Anderson to search for Mr. DiDonna, no officer had entered the residence. While searching for Mr. DiDonna, Officer Meyer saw narcotics in plain view in the office area of the living room. Detective Anderson found Mr. DiDonna hiding in the bathroom.

After locating Mr. DiDonna, Detective Anderson spoke with defendant outside the house. Defendant was asked if he would sign a consent form to

allow a search of his house. Defendant said he would. None of the officers had their guns drawn. Defendant was not handcuffed. Defendant was very cooperative. Detective Anderson completed the consent form just inside the front door of the residence, where defendant signed it. There were a total of seven "suspects" inside the residence. Detective Anderson and other officers searched the house. They discovered a substance resembling methamphetamine, a safe, pay and owe sheets, a scale, and a pipe. Also, the officers found Ziploc baggies containing an off-white substance resembling methamphetamine, and a smoking pipe.

In denying the section 1538.5 motion, the trial court noted: "Okay. The investigating officer or the witness who testified, we assume Detective Anderson is considered the I.O. on the case, had information that suggested that a parolee was there armed and dangerous, went to make a determination that that might in fact be correct. [¶] He proceeded—the officer proceeded in accordance with appropriate concern for officer's safety, ordered people out which was for officer's safety, the defendant didn't come out. The detective knew that he lived there and ordered him out personally because without the defendant there, we assume that the house is not completely empty. The defendant did exit. [¶] The officers asked for permission to go in [to] look for DiDonna, received that consent, went and looked for him, found him; in the process, drugs in plain view, made a request of the defendant to be able to search the premises. [¶] It does not appear that there was any undue coercion, pressure or fear on behalf of the defendant applied against him to get him to give that consent. Court believes it was freely and voluntarily given. After securing that consent, the officers went and found the drugs that are, apparently, the subject of this particular case."

We review a trial court's ruling on a motion to suppress evidence under section 1538.5 by applying the substantial evidence test to the factual determinations made by the court, with all presumptions favoring the trial judge's findings. (*People v. Camacho* (2000) 23 Cal.4th 824, 830 [98 Cal.Rptr.2d 232, 3 P.3d 878]; *People v. Ayala* (2000) 23 Cal.4th 225, 255 [96 Cal.Rptr.2d 682, 1 P.3d 3]; *People v. Woods, supra,* 21 Cal.4th at pp. 673-674; *People v. Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961]; *People v. Rios* (1976) 16 Cal.3d 351, 357 [128 Cal.Rptr. 5, 546 P.2d 293]; *People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) The California Supreme Court has further held " 'The trial court also has the duty to decide whether, on the facts found, the search was unreasonable within the meaning of the Constitution.' [Citation.] Because 'that issue is a question of law,' the appellate court is not bound by the substantial evidence standard in reviewing the trial court's decision thereon. Rather, . . . in such review it is 'the ultimate responsibility of the appellate

court to measure the facts, as found by the trier, against the constitutional standard of reasonableness.' [Citation.]" (*People v. Leyba, supra,* 29 Cal.3d at p. 597, quoting *People v. Lawler, supra,* 9 Cal.3d at p. 160; see also *People v. Camacho, supra,* 23 Cal.4th at p. 830.)

█ Defendant argues that when Detective Anderson walked into the backyard and knocked on the back door, the Fourth Amendment violation invalidated the subsequently obtained written and oral consents. We disagree. The touchstone of all Fourth Amendment determinations is reasonableness. (*United States v. Knights* (2001) 534 U.S. 112, 118 [122 S.Ct. 587, 591, 151 L.Ed.2d 497] [probation condition]; *United States v. Ramirez* (1998) 523 U.S. 65, 71 [118 S.Ct. 992, 996-997, 140 L.Ed.2d 191] [failure to knock and give notice during execution of a search warrant]; *Maryland v. Wilson* (1997) 519 U.S. 408, 411-412 [117 S.Ct. 882, 884-885, 137 L.Ed.2d 41] [traffic stop]; *Ohio v. Robinette* (1996) 519 U.S. 33, 39 [117 S.Ct. 417, 421, 136 L.Ed.2d 347, 148 A.L.R.Fed. 739] [consent]; *Maryland v. Garrison* (1987) 480 U.S. 79, 87-89 [107 S.Ct. 1013, 1018-1019, 94 L.Ed.2d 72] [error during the service of search warrant]; *Oliver v. United States* (1984) 466 U.S. 170, 177-178 [104 S.Ct. 1735, 1740-1741, 80 L.Ed.2d 214] [search of open field]; *Cardwell v. Lewis* (1974) 417 U.S. 583, 591-592 [94 S.Ct. 2464, 2470, 41 L.Ed.2d 325] [auto search].) █ In *Ohio v. Robinette, supra,* 519 U.S. at page 39 [117 S.Ct. at page 421], the United States Supreme Court described the proper method of assessing the reasonableness of official intrusions by police officers as follows: "We have long held that the 'touchstone of the Fourth Amendment is reasonableness.' *Florida v. Jimeno,* 500 U.S. 248, 250 [111 S.Ct. 1801, 1803, 114 L.Ed.2d 297] (1991). Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances. [¶] In applying this test we have consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry. Thus, in *Florida v. Royer,* 460 U.S. 491 [103 S.Ct. 1319, 75 L.Ed.2d 229] (1983), we expressly disavowed any 'litmus-paper test' or single 'sentence or . . . paragraph . . . rule,' in recognition of the 'endless variations in the facts and circumstances' implicating the Fourth Amendment. *Id.,* at 506 [103 S.Ct. at p. 1329]. Then, in *Michigan v. Chesternut,* 486 U.S. 567 [108 S.Ct. 1975, 100 L.Ed.2d 565] (1988), when both parties urged 'bright-line rule[s] applicable to all investigatory pursuits,' we rejected both proposed rules as contrary to our 'traditional contextual approach.' *Id.,* at 572-573 [108 S.Ct. at p. 1979]. And again, in *Florida v. Bostick,* 501 U.S. 429 [111 S.Ct. 2382, 115 L.Ed.2d 389] (1991), when the Florida Supreme Court adopted a *per se* rule that questioning aboard a bus always constitutes a seizure, we reversed, reiterating that the proper inquiry necessitates a consideration of 'all the circumstances surrounding the encounter.' *Id.,* at 439 [111 S.Ct. at p. 2389]." `

Defendant argues there was a trespass in his backyard. This trespass defendant contends is a conclusive consideration in the reasonableness calculation. In *United States v. Karo* (1984) 468 U.S. 705, 712-713 [104 S.Ct. 3296, 3302, 82 L.Ed.2d 530], the United States Supreme Court held: "The existence of a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated, however, for an actual trespass is neither necessary nor sufficient to establish a constitutional violation. Compare *Katz v. United States*, 389 U.S. 347 [88 S.Ct. 507, 19 L.Ed.2d 576] (1967) (no trespass, but Fourth Amendment violation), with *Oliver v. United States*, 466 U.S. 170[, *supra*,] (trespass, but no Fourth Amendment violation)." In *People v. Camacho, supra,* 23 Cal.4th at page 836, a case involving an intrusion into a side yard by two police officers, which we will discuss in depth later, the California Supreme Court explained the limited role of a technical trespass in the reasonableness formulation as follows: "That is not to say we find Officers Wood and Mora's search unlawful merely because they were trespassing on defendant's private property. The Supreme Court's decision in *Katz, supra,* 389 U.S. 347, 'refused to lock the Fourth Amendment into instances of actual physical trespass.' (*United States v. United States District Court* [(1972)] 407 U.S. [297,] 313 [92 S.Ct. 2125, 2134, 32 L.Ed.2d 752]; see also [*California v.*] *Ciraolo* [(1986)] 476 U.S. [207,] 223 [106 S.Ct. 1809, 1811-1812, 90 L.Ed.2d 210] (dis. opn. of Powell, J.) ['Since *Katz,* we have consistently held that the presence or absence of physical trespass by police is constitutionally irrelevant to the question whether society is prepared to recognize an asserted privacy interest as reasonable.'].)" (Fn. omitted.) In the omitted footnote, the *Camacho* majority explained the role of the trespass in the side yard in its reasonableness calculation as follows, "We emphasize our decision today is not based on the simplistic notion that police violate a defendant's constitutional rights whenever they commit a technical trespass. Although the dissent attempts to recharacterize our reasoning as resting on this single consideration [citation], the attempt fails. As we explain, we balance several factors to conclude police acted unreasonably in this case." (*People v. Camacho, supra,* 23 Cal.4th at p. 836, fn. 3.) Certainly, the fact that Detective Anderson trespassed in defendant's backyard is "marginally relevant," but not conclusive, in determining whether the ultimate seizure of the contraband was reasonable. *(United States v. Karo, supra,* 468 U.S. at pp. 712-713 [104 S.Ct. at p. 3302].)

▮ It is with these broad constitutional principles we evaluate the intrusion into defendant's backyard and its "marginally relevant" effect on the constitutional reasonableness calculation. Detective Anderson possessed probable cause to believe Mr. DiDonna was located in defendant's residence. Detective Anderson had been so informed by a reliable informant.

Mr. DiDonna had absconded from parole supervision. In fact, a parole arrest warrant had been issued by the Department of Corrections for Mr. DiDonna's arrest. Furthermore, Detective Anderson had spoken with defendant's parole officer. The parole officer indicated defendant was living in different residences. Mr. DiDonna was not even welcome in the home of his mother. Mr. DiDonna, who was considered armed, was "running around the Tujunga area." Defendant's home was located in a residential neighborhood. One hour after a reliable informant revealed that Mr. DiDonna was in defendant's home, Glendale police officers began to watch the residence. When Mr. Bilbulyan left, the officers stopped him. The officers erroneously believed Mr. Bilbulyan was Mr. DiDonna. When the officers under the direction of Detective Anderson immediately returned to defendant's house, it was necessary to continue to detain Mr. Bilbulyan. Otherwise, Mr. Bilbulyan could warn Mr. DiDonna of the police presence. Detective Anderson then walked into the backyard and knocked on the rear door. When someone in the residence asked who was knocking, Detective Anderson responded with his first name. All the occupants of defendant's residence, except Mr. DiDonna, ran to the front door. Before any officers entered the residence, Detective Anderson secured an oral consent to enter and search from defendant. While searching for Mr. DiDonna, Detective Anderson saw contraband in plain view. After Mr. DiDonna was arrested, Detective Anderson withdrew from the residence and secured a written consent to search from defendant. The seizure of the drugs in this case was reasonable because: there was probable cause to believe Mr. DiDonna was in defendant's house; Mr. DiDonna was a potentially armed parolee who was elusively moving from house to house; there was a legitimate public interest in ensuring he was promptly apprehended, particularly since he was hiding in a residential neighborhood; no officers entered the residence until after defendant gave his oral consent; and, after Mr. DiDonna was arrested, before any officers reentered the residence, defendant executed a written consent to search. These facts, which contain exigent circumstances including a legitimate law enforcement need to apprehend an absconding parolee who was considered armed and hiding in a home in a residential neighborhood, strongly outweigh the marginal relevant impact of the trespass into defendant's backyard.

Defendant places great weight upon the decision of the California Supreme Court in *People v. Camacho, supra,* 23 Cal.4th at pages 828-829. As noted above, *Camacho* involved a late-night search of a side yard. In *Camacho,* two police officers at 11:00 p.m. went to the defendant's residence in response to a municipal noise ordinance complaint. Upon arriving at the defendant's residence, the officers heard only "an unidentifiable 'audible noise.' " (*Id.* at p. 828.) Rather than knock on the front door, the two officers eventually made their way to a side yard and looked into a window

where they saw the defendant packaging cocaine. The majority held that the observations leading to the search were unreasonable. (*Id.* at pp. 829-838.)

But the *Camacho* majority emphasized that had other facts been present, the trespass into the side yard may very well have been reasonable. The majority held: "Thus, had [Officers] Wood and Mora been dispatched to defendant's house in response to a report of gunshots being fired, of screams being heard, or of a riot, a stabbing *or some other serious crime*, we cannot say their entry into the side yard would have been unlawful. Indeed, had the officers on their arrival at defendant's house heard a raucous party, confirming the anonymous complaint that brought them there in the first place, and had they then banged on the front door to no avail, their entry into the side yard in an attempt to seek the source of the noise would likely have been justified. [¶] The facts here paint quite a different picture: Called to investigate a complaint of excessive noise, an infraction under the city's municipal ordinances, the officers arrived at defendant's home late in the evening and heard no such noise. Without bothering to knock on defendant's front door, they proceeded directly into his darkened side yard. Most persons, we believe, would be surprised, indeed startled, to look out their bedroom window at such an hour to find police officers standing in their yard looking back at them." (*People v. Camacho, supra,* 24 Cal.4th at p. 836, italics added.) At a later point, the majority held: "As noted, if the facts were different, perhaps only slightly so, we might conclude the officers were entitled to enter defendant's yard, thereby validating the lawfulness of their observations of defendant through his bedroom window. The lateness of the hour, the relative lack of seriousness of the phoned-in complaint, and the failure first to knock on defendant's front door, all are relevant to evaluating the reasonableness of the officers' conduct in this case. We cannot say, however, that the officers, having arrived at defendant's house close to midnight in response to an anonymous complaint of a loud party and perceiving nothing amiss, were entitled to enter defendant's private property without a warrant and look through his windows." (*Id.* at pp. 837-838.)

The facts in the present case are very different from those in *Camacho.* The present case involves a potentially armed parolee who was the subject of a parole arrest warrant. Mr. DiDonna was hiding in a residential neighborhood; i.e., near families and children—a very, very serious matter not at all similar to a noise complaint. By contrast, *Camacho* involved a mere potential violation of a municipal noise ordinance—an infraction. In *Camacho,* the two officers, upon arriving at the scene, made no effort to knock on the front door and, in fact, what they initially observed indicated that no noise violation was occurring. In *Camacho,* the entry into the side yard, which gave rise to the observations of the defendant packaging contraband, was

unreasonable. In the present case, the entry into the backyard in order to knock on the rear door did not invalidate the subsequently obtained oral and written consents to search the residence. The observation and seizure of the contraband were made after securing separate oral and written consents—an established exception to the warrant requirement. (*Soldal v. Cook County* (1992) 506 U.S. 56, 65-66 [113 S.Ct. 538, 545-546, 121 L.Ed.2d 450]; *Illinois v. Rodriguez* (1990) 497 U.S. 177, 181 [110 S.Ct. 2793, 2797-2798, 111 L.Ed.2d 148].) *Camacho* is not controlling. Hence, because under the totality of the circumstances the seizure of the drugs pursuant to the oral and written consents was reasonable, the judgment must be affirmed.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

The judgment is affirmed.

Grignon, J., and Mosk, J., concurred.

---

*See footnote, *ante*, page 355.