Filed 8/10/21  P. v. Ralls CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE, | C087286 |
| Plaintiff and Respondent, | (Super. Ct. No. MCYK-CRBF-2015-137) |
| v. | |
| MITCHELL LEE RALLS, | |
| Defendant and Appellant. | |

Defendant Mitchell Lee Ralls fired a single shot through the window of a car in which Jeraime Whittle was sleeping during the early morning hours of January 21, 2015. The bullet entered Whittle's forehead and resulted in his death.  The evidence introduced during trial does not shed light on why defendant shot the victim.  The jury convicted defendant of first degree murder (Pen. Code, § 187),[1] possession of a firearm by a felon

---

[1]    Undesignated statutory references are to the Penal Code.

1

(§ 29800, subd. (a)(1)), unlawful possession of ammunition (§ 30305, subd. (a)(1)), and misdemeanor possession of more than 28.5 grams of marijuana (Health & Saf. Code, § 11357, subd. (b)).  The jury found true the allegation that defendant personally discharged a firearm in commission of the murder.  (§ 12022.53, subd. (d).)  The trial court found true the allegation that defendant had served a prior prison term.  (§ 667.5, subd. (b).)  The trial court sentenced defendant to an indeterminate prison term of 50 years to life plus a consecutive determinate term of 4 years 8 months.  The trial court also imposed various fines and fees.

On appeal, defendant contends (1) the trial court erred in denying his motion to suppress evidence seized pursuant to three search warrants, (2) two sentence enhancements imposed under section 667.5, former subdivision (b), must be stricken because a subsequent change in law renders that statute inapplicable to his prior prison term, (3) the restitution fine for his misdemeanor conviction must be stricken to reduce the total restitution fine to $10,000, and (4) under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) various fines and fees must be stayed until the trial court holds an ability to pay hearing on remand.

The Attorney General responds that the searches were lawfully executed under valid search warrants, defendant's two prior prison term enhancements must be stricken, the restitution fine must be reduced to $10,000, and the claim under *Dueñas* has been forfeited and lacks merit.

We conclude that the trial court properly denied the motion to suppress because all three search warrants were supported by probable cause.  Defendant's two 1-year sentence enhancements for the prior prison term must be stricken.  The total restitution fine must be reduced to $10,000.  We disagree with *Dueñas* and its reasoning.  Accordingly, we strike the $150 restitution fine imposed on the misdemeanor, and we strike the two 1-year sentence enhancements for the prior prison term.  In all other respects, we affirm.

# FACTUAL AND PROCEDURAL HISTORY

## *Prosecution Evidence*

On the night of January 20, 2015, Nicole Harmon and Whittle pulled their Oldsmobile into the Pilot Travel Center (Pilot) in Weed, California. A man hung out with Harmon and Whittle in their car as they talked for about three hours before the man exited the car and walked away. Harmon fell asleep around 9:00 p.m. while Whittle sang her to sleep. Harmon woke up around 5:30 a.m. to "the sound of a window bashing." She saw Whittle bleeding from the back of his head and also from the middle of his forehead. Harmon panicked, ran out of the car to see if anyone could help her, got back into the car, and called 911. Harmon applied direct pressure to the wound, but Whittle struggled against her and tried to wipe the blood out of his eyes. A police officer and ambulance arrived sometime later. After Whittle arrived at the hospital, he never regained consciousness. Whittle died of a single gunshot wound to his head. The bullet was recovered during the autopsy.

Lia Carter and Kimberly Cummins were working at the Pilot in the early morning hours on January 21, 2015. Carter had known defendant since her childhood. At 1:49 a.m., defendant entered the store while Carter was cashiering and bought gas for his Jeep. After defendant filled gas, Carter saw him parked in the Pilot parking lot "just sitting in the passenger seat of his car." Carter did not see anyone else. She checked on defendant every 30 to 40 minutes that early morning. Once, Carter saw defendant standing outside his vehicle while smoking.

Cummins testified that she had known defendant since elementary school. In the early morning hours of January 21, 2015, Cummins was told by a Pilot customer that defendant was asking about her. The customer was worried for Cummins and feared for Cummins's safety because the customer had seen a knife and marijuana on defendant's dashboard. Cummins went outside and saw defendant acting strangely "rocking his head

3

forward and backward, side to side." At 4:00 a.m., Cummins went outside, and defendant flicked his car lights at her. Around 4:15 a.m., Cummins observed defendant's Jeep parked immediately next to the Oldsmobile occupied by Whittle and Harmon. At 5:36 a.m., Carter saw defendant's Jeep speed out of the Pilot parking lot without stopping at the exit.

Weed Police Department Sergeant Justin Mayberry responded to the Pilot around 5:45 a.m. At the Pilot, Sergeant Mayberry located the Oldsmobile and observed shattered glass on the driver's side of the vehicle. No shell casing was found. Police officers recovered cigarette butts from the area around the Oldsmobile. Forensic testing determined that four of the cigarette butts matched defendant's DNA profile and one matched Whittle's DNA profile.

On January 26, 2015, Siskiyou County Sheriff's Department Patrol Sergeant Robert Giannini did a welfare check on defendant's residence. At the residence, Sergeant Giannini contacted defendant, his 16-year-old daughter M.,[2] his wife Amy, and Amy's son James. At the time of the welfare check, M. had a serious drug addiction. Approximately two hours prior to the welfare check, M. saw defendant with a gun. M. sent a text message about defendant's possession of the gun to Breanna Culbertson. Culbertson was M.'s fiancée at the time, and they texted each other often.

During the welfare check, M. told Sergeant Giannini that she had seen defendant with a gun. M., however, had not been the one to call the police. She suggested the police search defendant's bedroom and Jeep for the gun. Sergeant Giannini obtained consent from Amy to search the bedroom. The officer encountered defendant in his underwear. Defendant retrieved a pair of pants. Sergeant Giannini checked the pants to

---

[2]     We refer to defendant's daughter by her first initial in light of our discussion of M.'s juvenile record.

4

make sure they did not contain a weapon. The officer did not search defendant's Jeep or anywhere else.

M. was surprised that the police officer did not find the gun. Sergeant Giannini learned from Amy that she and defendant had been arguing that day but that she was not concerned for her safety. Defendant appeared calm and cooperative. Sergeant Giannini left and would later write a report in which he stated "disposition exceptionally cleared," meaning that the investigation of the welfare check had been concluded.

On January 27 and 28, 2015, police officers executed several search warrants on defendant's residence, Lincoln, and Jeep. Defendant also gave consent to search his Lincoln sedan that was parked in the carport. Inside the Lincoln, officers found a loaded .380 semiautomatic gun in a sock and another sock containing additional ammunition. M. identified the gun as one she had seen defendant carrying around the residence. In the living room, police officers found what they thought to be a soft-sided gun holster. In the master bedroom closet, the officers located a gun-cleaning kit, eight .357 Magnum ammunition rounds, and a .22-caliber round. Socks identical to those found in the Lincoln were retrieved from a dresser in the master bedroom.

Inside the Jeep, the police found the camouflage jacket that Cummins had seen defendant wear during the morning of the murder. The Jeep also contained three cell phones and an ice chest. The ice chest contained a total of 419.5 grams of marijuana distributed in four packages. California Highway Patrol Officer Kaylon Benson testified that he had participated in the search of defendant's residence and discovered the marijuana in the Jeep. Based on Officer Benson's training, he opined that the quantity of marijuana discovered in the Jeep was possessed for sale.

A firearms and ballistics expert compared the bullet retrieved from the victim's head with a bullet test-fired from the gun found in defendant's Lincoln. The bullet used to kill the victim had been fired from the gun retrieved from the Lincoln. Additional

5

forensic testing showed that defendant's DNA was present on the trigger and trigger guard of the same gun.

### *Defense Evidence*

Called by the defense as a witness, M. testified as follows: During defendant's trial, M. was incarcerated. On January 21, 2015, she was 16 years old. M. was living with her then-fiancée Breanna Culbertson even though she had not received permission from her parents to do so. M. had run away from home around December 2014. M. told her parents that she had been abducted when she had actually been living with Culbertson. M. was using heroin, OxyContin, methamphetamine, marijuana, and alcohol. She also smoked tobacco cigarettes. During January 2015, M. would go home and spend the night at her parents' house "from time to time." M.'s mother, Amy, would try to keep her home – sometimes by calling M.'s probation officer and filing missing person reports.

Sometime during in the early morning hours of January 21, 2015, M. was walking beside a road to see a family member because she and Culbertson had run out of toilet paper. Defendant was driving by, stopped, and asked if M. wanted a ride. M. got into the car because she missed him and her mother. M. spent a couple of hours talking with defendant. While they were talking, M. received a text from Culbertson telling M. to look for a backpack in a wooded area. M. found the backpack, looked inside, and discovered a gun. She did not tell defendant about the gun. M. went back to the cottage she shared with Culbertson. At the cottage, M., Culbertson, and a mutual friend smoked methamphetamine. Sometime during the next week, M. went to her parents' house where she hid the gun in defendant's Lincoln as instructed by Culbertson. M. later lied to the police about seeing defendant walking around with a gun – again, at the instruction of Culbertson.

6

James testified that he did not see his stepfather carry a gun around. A day after the initial welfare check, James observed the investigating officer enter their house and smoke a cigarette. The officer continued to smoke despite being asked not to do so.

Joseph Lapthorne testified that he worked as a private investigator, having previously retired from service as a California Highway Patrol officer. Based on his training and experience, Lapthorne opined that the marijuana found in defendant's Jeep was not possessed for sale. Lapthorne also testified that it was possible for a car to bypass the north parking lot and exit of the Pilot by taking a dirt road behind the semitruck parking area.

### *Rebuttal Evidence*

On rebuttal, City of Weed Police Corporal James Clair testified that he showed a photo of the gun retrieved from the Lincoln to M. M. identified the gun as the one that she had seen defendant carrying. M. appeared to be apprehensive. She stated she did not feel safe because defendant "was dangerous." M. never mentioned Culbertson, a backpack, or that she had been talking with defendant on the morning of the murder.

### *Surrebuttal Evidence*

Amy testified that the police misidentified a child's seatbelt harness for a gun holster.

## DISCUSSION

## I

### *Motion to Suppress*

Defendant contends the trial court erred in denying his motion to suppress evidence seized pursuant to three search warrants as well as the consent search of the Lincoln sedan.

7

## A.

### *Search Warrants*

We review the background of the first three search warrants authorized for defendant's residence because of the scope of the argument presented by defendant. Defendant limits his appellate challenge to the first three search warrants on grounds that he "lacks standing to challenge some of the searches, and none of the evidence seized was critical to the prosecution's case, particularly without the evidence seized pursuant to the first three search warrants."

### 1.  *The First Search Warrant*

At 3:55 p.m. on January 27, 2015, the trial court approved a warrant to search defendant's residence, including any containers, vehicles, and outbuildings at the residential property.  The search warrant was supported by attachments A, B, and C. Attachment A contains Corporal Clair's statement of expertise in law enforcement with an emphasis on training relating to illicit substances and crime investigations.

In attachment A, Corporal Clair also related that a welfare check had been conducted on defendant's residence on January 26, 2015, after a "reporting party stated that there was a male subject at the residence and was in possession of a handgun." However, "[t]he result of the call was found unfounded."  Defendant's "extensive criminal history" was listed along with the fact that his prior convictions prohibited him from possessing a firearm.  For additional probable cause, the attachment referred to the sealed attachment B.

In attachment B, Corporal Clair stated that he received snapshots of text messages between M. and Culbertson.  The snapshots were included in attachment C, another sealed portion of the application for the search warrant.  On the first page of the snapshots, Culbertson tells M. that a friend said defendant committed the shooting at the Pilot.  M. subsequently texted Culbertson:  "And I don't even want to be in the same

8

fucking room with him . . Dude he's standing here with a gun in his back pocket right now!"

In additional text messages, M. told Culbertson that the police left without finding anything, that they asked defendant to search his Jeep but M. thought he refused, and that M. worried defendant "will flip out on us." Culbertson told M. that the police would be back with a search warrant. M. responded, "This is retarded like they obviously didn't fucking look good enough!!!!!! [¶] I hope so!! This is fucking dumb dude they are suppose to protect people!" Culbertson immediately texted back, "Delete all your texts and messages. Please. Like now." M. also texted Culbertson: "If they know it was him at pilot why don't they just fucking arrest him!!!" Culbertson answered: "Because they don't have evidence babe."

In addition to recounting the substance of the text messages between M. and Culbertson, attachment B also reviewed the welfare check that had occurred the prior day. Corporal Clair noted, "A weapon was not located and the report shows the conclusion was unfounded." Corporal Clair recounted that he had earlier that day spoken by telephone with Culbertson as follows: "I asked her to tell me what had happened. She advised me that her friend, [M.] had sent her a text message about her dad 'freaking out' and walking around the house carrying a gun. [M.] advised [Culbertson] that [M.] had been dropped off at the residence and that [defendant] did not know who she ([M.]) was. [M.] advised [Culbertson] that [defendant] grabbed a handgun and confronted [M.] stating to her, 'you almost got shot.' [¶] [Culbertson] stated that she is afraid for [M.'s] safety as well as the safety of [M.'s[3]] mother and siblings. [Culbertson] stated that [defendant] is violent and a dangerous person."

---

**3**      Although attachment B uses Culbertson's name here, context suggests that Corporal Clair intended to refer to M.

Corporal Clair explained that attachments B and C were filed confidentially because he felt "that if any of these informants' identities are revealed it could subject them to possible physical retaliation, endangering their lives and their family's health. Based on the criminal history of [defendant] and his past [drug] abuse (per [M.]), I believe that [defendant] would go to the extents of killing either [M.] or [Culbertson] if he was to be made aware that they had talked to each other, thus leading the information to me. I fear for the safety of both [M.] and [Culbertson]."

The return to the search warrant lists items seized from defendant's residence including: eight .357 Magnum bullets, a .22-caliber bullet, a four-bladed shuriken, a gun-cleaning kit, Remington bore cleaner, a glass smoking pipe with crystalline residue, several cell phones, and four bags containing a total of 419.5 grams of marijuana.

### 2. *The Second Search Warrant*

The second search warrant was approved at 11:05 p.m. on January 27, 2015. The warrant authorized the search of defendant's residence and his Lincoln sedan. In support of the application for the second warrant, Corporal Clair stated that the Lincoln was observed in the carport of defendant's residence during the search pursuant to the first warrant. Corporal Clair further explained: "I contacted [defendant] who was seated in the back of a [Siskiyou County Sheriff's Department] patrol vehicle. [Defendant] was handcuffed in front and was smoking a cigarette. I asked him who the Lincoln belonged to, he stated, 'Me I guess.' I asked him if I had his permission to search the vehicle. He stated, 'Yeah, I guess.'"

Corporal Clair continued that police searched the Lincoln, including the trunk. "Located behind the carpet, down near the passenger side rear wheel well, in a white sock was a small, black Davis Industries .380 caliber semi-automatic hand gun, containing a loaded magazine with five rounds of .380 ammunition loaded in it. Located near the hand gun was another white sock containing seven lose [*sic*] .380 caliber rounds of

10

ammunition." Based on these discoveries, Corporal Clair stated that they expected to find defendant in possession of a handgun.**4**

The application for the second warrant contained attachment B, a confidential summary of Corporal Clair's interaction with M. Corporal Clair showed a photo of the .380 gun found in the Lincoln to M. M. confirmed that the photo showed the gun she had seen defendant carrying around on January 26, 2015. M. also said she was " '[v]ery much' " afraid of defendant.

The return to the second search warrant states that police officers seized a .380 Davis Industries semiautomatic handgun, seven .380-caliber bullets, a magazine containing another five .380 bullets, and socks in which the items were discovered.

### 3. *The Third Search Warrant*

At 2:20 a.m. on January 28, 2015, the trial court approved a third warrant to search defendant's residence, including defendant's Jeep and Lincoln as well as the persons of defendant, Amy, and M. In support of the application, City of Weed Police Officer Jared Klomparens stated that he had been informed Whittle had died of a gunshot wound to his forehead. Officer Klomparens attended the autopsy of Whittle, which yielded a .380-caliber bullet. The officer noted that a prior search of defendant's residence resulted in the discovery of a .380-caliber handgun from defendant's Lincoln. Based on the information in the application, Officer Klomparens expected that evidence related to the murder would be found at defendant's residence.

In the confidential attachment to the application for the warrant, Officer Klomparens recounted that he had spoken with Carter and Cummins at the Pilot. Both Carter and Cummins reported seeing defendant come into the Pilot during the evening of

---

**4**      The application does not make clear whether Corporal Clair referred to the handgun already found in the Lincoln or whether the officer expected to find an additional firearm.

11

January 20, 2015, and through the early morning hours of January 21, 2015. And both witnesses recounted that defendant's vehicle was parked next to the Oldsmobile during the early morning hours of January 21, 2015. Officer Klomparens also noted the welfare check that had been conducted on January 26, 2015, but had not yielded any guns.

A return to the third warrant lists the items seized as including a backpack containing shards of glass and men's pants with possible blood stains.

### 4. Defendant's Motion to Suppress

In October 2015, defendant filed a motion to suppress evidence and unseal the affidavits relied upon by the police in applying for the three search warrants issued for defendant's residence, Jeep, Lincoln, and persons of defendant, Amy, and M. The prosecutor opposed the motion. After a hearing on the motion, the trial court ordered that the three search warrants issued for defendant's residence, Jeep, Lincoln, and persons of defendant, Amy, and M. be unsealed consistent with *People v. Hobbs* (1994) 7 Cal.4th 948.[5] In November 2015, defendant filed a supplemental motion to suppress in which he moved to suppress the evidence seized pursuant to nine search warrants. Defendant argued that the first search warrant was secured based on material omissions in the support affidavit and that all subsequent search warrants were therefore the fruits of the first unlawful search.

### 5. Trial Court Order Denying the Motion to Suppress

The trial court denied the motion to suppress the evidence. In denying the motion as to the first and second search warrants, the trial court noted that it did not consider statements made in text messages between M. and Culbertson that related to defendant's possible involvement in Whittle's murder. However, the trial court found that M. was very emphatic that she saw defendant with a firearm and was consistently frightened

---

[5]     The trial court denied the motion to unseal insofar as it sought to unseal matter related to Facebook accounts belonging to M. and Culbertson.

about his possession of the gun. Moreover, M. was also very emphatic that defendant confronted her with the firearm. M. made her statements to a friend and not to law enforcement for purposes of having defendant arrested.

The trial court took into account that Culbertson "may have less than a stellar background," and M. "had some difficulty as well involving acts of moral turpitude as a juvenile." However, the fact that the texts were made between close friends and not for purposes of getting defendant arrested lent indicia of reliability to them. On these bases, the trial court found that there had been probable cause for the first and second search warrants relating to defendant's residence and vehicles.

In denying the motion to suppress as it related to the first and second warrants, the trial court rejected an argument of defense counsel that the welfare check had proven unfounded. The trial court noted that it considered the welfare check, but that it also considered a later conversation between M. and Culbertson in which M. believed that the handgun was in the Jeep or elsewhere outside the residence. This text exchange "would, again, raise a new – the very distinct possibility that [defendant] with a prior felony conviction was in possession of a weapon and had hidden that weapon."

The trial court found probable cause supported the third search warrant, which included defendant's residence, the Jeep, the Lincoln, and the persons of defendant, Amy, and M. The third search warrant was supported by statements of two witnesses at the Pilot who personally knew defendant. Both witnesses had seen defendant loitering at the Pilot parking lot at the time that Whittle's car was parked there. Indeed, defendant's Jeep was seen parked immediately next to Whittle's Oldsmobile. The Jeep left the parking lot at 5:36 a.m. – four minutes before Harmon called 911. The trial court further noted that

13

the bullet retrieved from Whittle's body was consistent with the gun recovered from defendant's Lincoln.**6**

## B.

### *Review*

Under the Fourth Amendment, the issuance of a search warrant requires probable cause so that the " 'facts contained in the affidavit are such as would lead a [person] of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion of the guilt of the accused.' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1041, quoting *Skelton v. Superior Court* (1969) 1 Cal.3d 144, 150.) "In determining whether an affidavit is supported by probable cause, the magistrate must make a 'practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.' (*Illinois v. Gates* [(1983)] 462 U.S. [213,] 238 [76 L.Ed. 2d 527].) The sufficiency of the affidavit must be evaluated in light of the totality of the circumstances. (*Ibid*.)" (*Fenwick & West v. Superior Court* (1996) 43 Cal.App.4th 1272, 1278.)

A defendant may challenge the veracity of a facially valid search warrant affidavit on the grounds it contains misrepresentations or omissions. (*Franks v. Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667]; *People v. Kurland* (1980) 28 Cal.3d 376, 384.) "[A]n affidavit may be insufficient when it omits facts adverse to the warrant application." (*Kurland,* at p. 384.) However, the affiant has a duty only to disclose facts that are material, meaning "only those omissions which significantly distort[] the probable cause analysis" will make an affidavit insufficient. (*Id*. at p. 385.) "On review under section 1538.5, facts must be deemed material . . . if, because of their inherent probative force,

---

**6** The trial court additionally denied the motion to suppress as it related to subsequent search warrants. However, these subsequent search warrants are not challenged on appeal by defendant, nor are they germane to our analysis.

14

there is a substantial possibility they would have altered a reasonable magistrate's probable cause determination." (*Ibid.*) A material omission will not render an affidavit insufficient if the affiant reasonably, even if incorrectly, concluded the omitted fact was immaterial. (*Id.* at pp. 388-389.) Thus, the defense bears the burden of showing " 'with some specificity,' " why material facts were omitted and why those facts are material. (*Id.* at p. 390.)

We review the denial of a motion to suppress evidence by deferring to the trial court's factual findings, but we exercise our independent judgment as to whether the search was lawful on the basis of the found facts. (*People v. Tully* (2012) 54 Cal.4th 952, 979.) "Thus, while we ultimately exercise our independent judgment to determine the constitutional propriety of a search or seizure, we do so within the context of historical facts determined by the trial court. 'As the finder of fact . . . the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable.' (*People v. Woods* (1999) 21 Cal.4th 668, 673.) We review its factual findings ' " 'under the deferential substantial-evidence standard.' " ' (*People v. Ayala* (2000) 23 Cal.4th 225, 255.) Accordingly, '[w]e view the evidence in a light most favorable to the order denying the motion to suppress' (*People v. Manderscheid* (2002) 99 Cal.App.4th 355, 357), and '[a]ny conflicts in the evidence are resolved in favor of the superior court ruling.' (*People v. Limon* (1993) 17 Cal.App.4th 524, 529.) Moreover, the reviewing court 'must accept the trial court's resolution of disputed facts and its assessment of credibility.' (*People v. Valenzuela* (1994) 28 Cal.App.4th 817, 823.)" (*Ibid.*)

## C.

### *Validity of the Search Warrants*

The trial court correctly denied defendant's motion to suppress the first three search warrants. The application for the first search warrant was supported by text messages from M. to Culbertson in which she reported that defendant had a gun on his person even while M. was sending the text. M. worried that defendant would "flip out" on them. And, M. expressed incredulity that the police officer had not found the gun during the welfare check. Culbertson believed that M. was in danger. M.'s contemporaneous observation of defendant's possession of a gun while texting supported the finding of probable cause to issue the first search warrant.

As the trial court found, M.'s texts supported a finding of probable cause even though M. and Culbertson were "less than . . . stellar" sources of information. Despite these witnesses' backgrounds, the texts relied upon in the application for the warrant were not sent for purposes of informing the police or to get defendant arrested. Instead, the texts were communications between friends that were not intended for disclosure. Indeed, Culbertson implored M. to delete the text messages. While the trial court acknowledged the problems of M.'s and Culbertson's credibility, the trial court was well within its discretion to find that the text messages supported probable cause that defendant had a gun in his possession at a time when he was prohibited from doing so.

Defendant argues that the affidavit for the first search warrant was misleading because it did not properly inform the trial court of the extent of the unsuccessful search incident to the welfare check on January 26, 2015. We are not persuaded. Corporal Clair's affidavit expressly disclosed that the sheriff's department had conducted the welfare check and determined the concern to be unfounded. More importantly, the first search warrant was supported by probable cause in the form of M.'s contemporaneous observation that defendant was carrying a firearm. The limited nature of the welfare

16

check did not undermine the probative nature of M.'s statements about the gun to Culbertson. Regardless of the outcome of the welfare check, M.'s text messages provided adequate basis for finding probable cause to issue the first search warrant.

In the return to the first search warrant, the police reported that they seized several bullets, a gun-cleaning kit, Remington bore cleaner, and more than 400 grams of marijuana. The return to the first warrant does not list the Davis Industries .380-caliber handgun found in the Lincoln. As the affidavit to the application for the second search warrant shows, the police recovered the .380-caliber handgun after defendant gave consent to search his Lincoln. Defendant's motion recounts that defendant articulated his consent and contains a single sentence to the effect that he "also move[d] to suppress his 'consent' for officers to search" his Lincoln. However, defendant did not attempt to show how his consent was invalid. Accordingly, defendant did not develop the contention sufficiently to preserve it for review. (*People v. Williams* (1999) 20 Cal.4th 119, 130.)

Defendant's challenges to the second and third search warrants depend on his ability to establish that the first search warrant was invalid and that his consent to the search of the Lincoln was not voluntary. As we have explained, however, probable cause supports the issuance of the first search warrant and defendant has not preserved his challenge to the voluntariness of his consent. The seizure of bullets, a gun-cleaning kit, bore cleaner, and .380-caliber gun supported the issuance of the second and third search warrants – especially after Whittle's autopsy revealed that the murder weapon was a .380-caliber firearm. In sum, we conclude that all three of the search warrants now challenged by defendant were supported by probable cause. The trial court did not err in denying defendant's motion to suppress the evidence seized pursuant to the first three search warrants.

17

## II

### *Sentence Enhancements*

Defendant argues that his two 1-year sentence enhancements imposed under section 667.5, former subdivision (b), must be stricken based on the retroactive application of Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill 136). The Attorney General agrees that the two sentence enhancements must be stricken. We accept the concession and order the two 1-year enhancements stricken.

Defendant's total prison sentence included two 1-year sentence enhancements that the trial court imposed under section 667.5, former subdivision (b), after the court found defendant had served a prior prison term. Defendant's prior prison term was imposed for corporal injury on a spouse or cohabitant. (§ 273.5, subd. (a).) Section 273.5 is not an offense included among sexually violent offenses under Welfare and Institutions Code section 6600, subdivision (b).

On October 8, 2019, the Governor signed Senate Bill 136 (2019-2020 Reg. Sess.), effective January 1, 2020 (Stats. 2019, ch. 590, § 1). Senate Bill 136 amended section 667.5 to limit eligibility for the one-year prior prison term enhancement to those who have served a prior prison sentence for a sexually violent offense. The amended provision states, in pertinent part: "Except where subdivision (a) applies, where the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code, provided that no additional term shall be imposed under this subdivision for any prison term served prior to a period of five years in which the defendant remained free of both the commission of an offense which results in a felony conviction, and prison custody or the imposition of a

18

term of jail custody imposed under subdivision (h) of Section 1170 or any felony sentence that is not suspended."  (§ 667.5, subd. (b).)

Here, defendant's prior prison term was not for a sexually violent offense as defined in subdivision (b) of section 6600 of the Welfare and Institutions Code. Defendant is therefore entitled to the ameliorative benefit of the statute because Senate Bill 136 applies retroactively.  (*People v. Matthews* (2020) 47 Cal.App.5th 857, 864-865; *People v. Lopez* (2019) 42 Cal.App.5th 337, 341.)  Consequently, defendant's two prior prison term enhancements under section 667.5, former subdivision (b), should be stricken.

## III

### *Restitution Fine for the Misdemeanor Conviction*

Defendant contends the $150 restitution fine imposed for his misdemeanor conviction must be stricken because its addition to his other restitution fine exceeds the $10,000 statutory maximum for section 1202.4, subdivision (b).  The Attorney General agrees that the trial court lacked discretion to impose the $150 restitution fine for defendant's misdemeanor conviction.  We order the $150 restitution fine stricken.

During sentencing, the trial court imposed a $10,000 restitution fine for defendant's felony convictions pursuant to section 1202.4, subdivision (b)(2).  The trial court also imposed a $150 restitution fine under section 1202.4 for his misdemeanor possession of more than 28.5 grams of marijuana.  The abstract of judgment reflects the $10,000 restitution fine under section 1202.4, but not the $150 restitution fine.

Section 1202.4 provides in pertinent part:  "(b) In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record.  [¶]  (1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense.  If the person is convicted of

19

a felony, the fine shall not be less than three hundred dollars ($300) and not more than ten thousand dollars ($10,000). If the person is convicted of a misdemeanor, the fine shall not be less than one hundred fifty dollars ($150) and not more than one thousand dollars ($1,000)."

Section 1202.4 limits the restitution fine to $10,000 in a case involving at least one felony conviction. "Where a defendant has been convicted of several felony offenses in one proceeding, a restitution fine is not imposed on '*each* count' but instead one fine is imposed taking into account all the offenses in the proceeding; this proposition is based on the language of section 1202.4, subdivision (b) which states that in '*every case* where a person is convicted of a crime, the court shall impose a separate and additional restitution fine,' and then sets forth a formula for calculating the total amount. (Italics added.)" (*People v. Holmes* (2007) 153 Cal.App.4th 539, 547.) When a defendant is convicted of a felony and misdemeanor in the same case, the total restitution fine may not exceed the statutory maximum. (*Id.* at p. 548.)

Here, the $150 restitution fine for the misdemeanor conviction caused the total restitution fine to exceed the statutory maximum of $10,000. The statutory maximum may not be exceeded regardless of the number of victims or counts of conviction. (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1534.) Accordingly, we modify the judgment to reduce the restitution fine imposed under section 1204, subdivision (b), to a total of $10,000. (*Blackburn,* at p. 1534.)

## IV

### *People v. Dueñas*

Defendant argues the trial court violated due process principles when it imposed a court security fee under section 1465.8, a criminal conviction assessment under Government Code section 70373, and the restitution fine under section 1202.4, subdivision (b) – without first holding a hearing to determine defendant's ability to pay

20

these fines. The Attorney General responds that (1) defendant has not preserved the issue for lack of timely objection; (2) on the merits, the proper analytic lens through which we should consider defendant's challenge is the excessive fines clause of the Eighth Amendment, and (3) the imposition of fines did not violate either the excessive fines clause or due process principles. We reject the due process challenge.[7]

Defendant's due process claim hinges on the analysis in *Dueñas*, *supra*, 30 Cal.App.5th 1157, finding an ability to pay hearing is required before imposing fines and fees. We are not persuaded by the analysis is in *Dueñas*. We note that the California Supreme Court is currently reviewing this issue in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844. *Kopp* rejected the due process analysis in *Dueñas* as it related to the restitution fine. (*Kopp*, at p. 96.)

We join several other courts in concluding that the principles of due process do not require determination of a defendant's present ability to pay before imposing the fines and assessments at issue in *Dueñas* and in this proceeding. (*People v. Cota* (2020) 45 Cal.App.5th 786, 795; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 329, review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928.)

## DISPOSITION

The two 1-year sentence enhancements imposed under section 667.5, former subdivision (b), are stricken. The restitution fine imposed under section 1202.4, subdivision (b), is reduced to a total fine of $10,000. In all other respects, the judgment

---

[7]     Our conclusion that defendant's due process challenge lacks merit obviates the need to consider whether the issue has been properly preserved. And, because defendant declines the Attorney General's invitation to reframe his argument as an Eighth Amendment claim, we do not consider the argument that his restitution fine may held unconstitutional under the Eighth Amendment.

is affirmed.  The clerk of the superior court is directed to prepare an amended abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.


/s/
HOCH, J.


We concur:


/s/
BLEASE, Acting P. J.


/s/
MURRAY, J.

22